# IN THE COURT OF APPEALS OF IOWA

No. 17-2059
Filed May 15, 2019

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**JORGE SANDERS-GALVEZ,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Des Moines County, Mary Ann

Brown, Judge.


        Jorge Sanders-Galvez appeals his conviction for murder in the first degree.

**AFFIRMED.**


        Mark C. Smith, State Appellate Defender, (until withdrawal) and Shellie L.

Knipfer, Assistant Appellate Defender, for appellant.

        Thomas J. Miller, Attorney General, and Tyler J. Buller, Assistant Attorney

General, for appellee.


        Heard by Vaitheswaran, P.J., and Doyle and Tabor, JJ.

**VAITHESWARAN, Presiding Judge.**

A Burlington teenager was shot to death in an alley. The State charged twenty-one-year-old Jorge Sanders-Galvez and another individual with first-degree murder. *See* Iowa Code §§ 703.1, 703.2, 707.1, 707.2 (2016). A jury found Sanders-Galvez guilty as charged.

On appeal, Sanders-Galvez contends (1) the evidence was insufficient to support the jury's finding of guilt; (2) his trial attorney was ineffective in failing to object to a statement on hearsay grounds; (3) the district court abused its discretion in admitting a phone video; and (4) juvenile-sentencing precedent "should be expanded" to young adults.

## I.    Sufficiency of the Evidence

The jury was instructed Sanders-Galvez could be found guilty of first-degree murder of a teenager, K.J., either as a principal or aider and abettor and either (1) "willfully, deliberately, premeditatedly, and with specific intent to kill" or while (2) "participating in the offense of kidnapping." The jury returned a general verdict.

In light of the general verdict, we cannot determine which of the murder theories the jury accepted. *See State v. Smith*, 739 N.W.2d 289, 295 (Iowa 2007) (stating because the jury was instructed to return a general verdict, court had "no way of knowing" which of multiple theories the jury adopted). To uphold the finding of guilt, then, we must find substantial evidentiary support for both theories. *See State v. James*, No. 13-1067, 2014 WL 4230203, at *7 (Iowa Ct. App. Aug. 27, 2014) ("Submission of multiple alternatives to the jury is permissible only if substantial evidence is presented to support each alternative method of committing a single crime." (citing *State v. Bratthauer,* 354 N.W.2d 774, 776 (Iowa 1984))); *cf.*

*State v. Myers*, 924 N.W.2d 823, 827 (Iowa 2019) ("[S]ubstantial evidence must support each alternative under the statute.").

Sanders-Galvez does not challenge the sufficiency of the evidence supporting guilt under the premeditated-murder alternative. He argues the evidence was insufficient to support a finding of guilt under the felony-murder-by-kidnapping alternative.

Kidnapping was defined for the jury as:

> [A] person confining another person or removing a person from one place to another, knowing that the person who confines or removes the other person has neither the authority nor consent of the other to do so; provided that the person does so with the intent to secretly confine the other person. A person is confined when his freedom to move about is substantially restricted by force, threat, or deception. The person may be confined either in the place where the restriction began or in place to which he has been removed. No minimum time of confinement or distance of removal is required. It must be more than slight. In this case the confinement or removal must have significance apart from the murder of [K.J.] In determining whether confinement or removal exists, you may consider whether (1) the risk of harm to [K.J.] was substantially increased, (2) the risk of detection was significantly reduced, or (3) escape was made significantly easier.

"Secretly confine" was defined for the jury as "more than restricting the movement of [K.J.]" The phrase requires "an intent to conceal or hide [K.J.] to prevent his discovery." Sanders-Galvez asserts "there was no showing of removal or confinement beyond that associated with the murder."

A jury could have found the following facts. K.J. went to Hy-Vee the evening of his death. Sanders-Galvez and his co-defendant entered Hy-Vee while K.J. was inside.[1] As K.J. began to leave, Sanders-Galvez "look[ed] in [his] direction." A

---

[1] The State jointly charged Sanders-Galvez and the co-defendant, but the district court granted Sanders-Galvez's motion to sever.

minute later, Sanders-Galvez checked out at the cash register. Three minutes later, he and the co-defendant left the store and got into a red Impala. Meanwhile, K.J. began walking towards his friend A.W.'s house a block-and-a-half away. As K.J. "walk[ed] across the parking lot," "the red Impala [came] in behind him." When K.J. arrived at A.W.'s house, he told her he "was scared" because "Lumni"—a nickname for Sanders-Galvez—"was following him."[2] A.W. asked K.J. "if he wanted a ride home or if he wanted to stay a little longer or if he wanted to go out the back door." K.J. said no to all the options. A.W. looked out her bedroom window and "[s]ort of" saw "the end of a red car . . . parked illegally on [her] side [of the street]." K.J. "talked a little longer and then he left" at around 10:20 p.m.

Approximately one hour later, a woman heard gunshots coming from an alley near her home. She called 911.

Burlington police officers found K.J.'s body partially "hidden" by tall, overgrown grass next to a garage. Officers smelled bleach as they approached the body. K.J.'s skin and genitals showed signs of bleach injuries. K.J. was "not wearing any shoes." His arms were "above his head" and a black trash bag covered his head. The bag contained "deformities," "like somebody was trying to grab at it and pull it and actually stretched a hole in the bag." The bag also contained bullet holes. An autopsy indicated K.J. struggled to breathe in the time leading up to his death, but the cause of death was close-range gunshot wounds to his chest.

---

[2] Though Sanders-Galvez challenges the admissibility of this statement, we are obligated to consider it in assessing the sufficiency of the evidence. *State v. Dullard*, 668 N.W.2d 585, 597 (Iowa 2003).

A search of the house Sanders-Galvez frequented on the night of the murder uncovered a box of trash bags matching the bag found on K.J.'s head. In the upstairs bedroom, police found K.J.'s backpack containing his Burlington High School identification card, among other things, and a pair of shoes "connect[ed] . . . back to" K.J. based on video footage. K.J.'s belongings were found near a bed with blue sheets; fibers from the sheets matched those found on K.J.'s clothing.

One of Sanders-Galvez's acquaintances testified that Sanders-Galvez and the co-defendant came to his home on the night of the murder in a red Impala. The acquaintance further stated Sanders-Galvez was carrying a chrome-colored "long-barrel" revolver that looked like a "cowboy gun." According to the acquaintance, Sanders-Galvez and the co-defendant left his house to pick up food at Hy-Vee, a roundtrip that should have taken fifteen to twenty minutes. They did not return until "a couple hours" later. Sanders-Galvez told him they had to "make a quick stop." On their return, the acquaintance surmised the two were "nervous." Before Sanders-Galvez left later that night, he asked the acquaintance to hold his gun. Sanders-Galvez retrieved the gun the next morning. At trial, Sanders-Galvez confirmed the acquaintance's narrative about the gun.

A search of Sanders-Galvez's phone uncovered no messages during the estimated time of the killing. "Within about an hour after the murder," Sanders-Galvez sent "a number of messages" indicating he was planning to leave Burlington. The morning after the shooting, his phone revealed internet searches for news of the shooting.

Several days after the shooting, Missouri police stopped a red Impala for failing to signal before changing lanes. A license-plate inquiry "came back as

wanted to a homicide." As police approached the vehicle, the Impala sped off and led the officers on a "high-speed chase." The chase ended when the vehicle crashed into a guardrail. The co-defendant was driving the car. He fled but was later apprehended. Although Sanders-Galvez was not in the vehicle, his latent prints were discovered on the vehicle. Police also found "a silver revolver with a wooden grip" on the driver's side floorboard.

Testing confirmed the bullets that killed K.J. were fired from the silver revolver. Sanders-Galvez's social media posts contained images of a revolver resembling the revolver found in the vehicle. Sanders-Galvez's "on-and-off girlfriend" confirmed she saw him with a "cowboy gun" before the murder.

From this evidence, the jury reasonably could have found that Sanders-Galvez confined and removed K.J., as required for commission of kidnapping. Specifically, the jury could have found "secret confinement" based on the presence of K.J.'s belongings in the upstairs bedroom of the house Sanders-Galvez frequented; the bag over K.J.'s head and the signs of his struggle to extricate himself; the bleach injuries to his body; and his placement in a stand of tall grass. *See State v. Albright*, 925 N.W.2d 144, 156 (Iowa 2019). The jury could have found removal based on K.J.'s apparent presence on the bed in the upstairs bedroom and his later discovery in an alley, partially hidden by tall grass.

We recognize the evidence was circumstantial. But direct and circumstantial evidence are equally probative. *See State v. Rich*, 305 N.W.2d 739, 746 (Iowa 1981). The jury could have found "ample circumstantial evidence" of guilt. *State v. Bentley*, 757 N.W.2d 257, 262 (Iowa 2008).

The jury also could have considered Sanders-Galvez's changing stories. *See State v. Milom*, 744 N.W.2d 117, 122 (Iowa Ct. App. 2007). At trial Sanders-Galvez conceded his trial testimony was inconsistent with what he told police at the time of his arrest and, indeed changed while he was talking to police.

Because the record contains substantial evidence to support the felony-murder theory, we affirm the jury's finding of guilt for first-degree murder.

## II. Admission of Hearsay Evidence

Sanders-Galvez contends his trial attorney was ineffective in failing to object to A.W.'s statement, that "Lumni was following" K.J. He argues the statement was hearsay. We find the record inadequate to address the issue. *See State v. Tompkins*, 859 N.W.2d 631, 643 (Iowa 2015). Accordingly, we preserve the claim for possible postconviction relief. *See State v. Harris*, 919 N.W.2d 753, 754 (Iowa 2018).

## III. Admission of Phone Video

Sanders-Galvez contends the district court abused its discretion in admitting a phone video recorded at the home where K.J.'s belongings were found. The video, shot by Sanders-Galvez, was "about 25 seconds long" and showed his co-defendant engaging in sex.

At trial, Sanders-Galvez's attorney objected to the admission of the video on the ground that "the prejudicial effect" "would outweigh any probative value." *See* Iowa R. Evid. 5.404(b). The State responded:

> The government is offering this evidence to show the defendant's motive as well as connection to his co-defendant and connection to the crime scene.
>     . . . .

Your Honor, the State will be introducing this for a number of different reasons: that it shows a connection of the co-defendants; it establishes that they are comfortable having sexual activities in front of each other; it supports the State's theory of motive, that the reason why defendant and [co-defendant] would have picked up [K.J.] is to take [K.J.] back to [the house] to have sex with him; and it shows the defendant's specific connection to the bedroom where [K.J.]'s belongings were found.

. . . .

As to prejudice, your Honor, this is different than most cases where 5.404(b) evidence would be introduced in that this is not a prior crime, this is not a prior bad act, this appears to be consensual sex between adults.

The district court admitted the evidence, reasoning:

In this case the State's theory is that there was, in essence, a plan between Mr. Sanders-Galvez and [the codefendant] to take [K.J.] back to this house . . . and have sex with him. This video would be evidence that would show that act was consistent with other plans or knowledge or also disprove any absence—or any mistake or accident. So I conclude that it could be relevant under this rule of evidence and would be admissible.

Then I must do the balancing test. It's not a long video and, as counsel also points out, it is not a crime. It's a consensual sex act, from all that can be told in the video, but it really does not appear to be highly prejudicial against the defendant and I will allow the evidence in.

Sanders-Galvez argues the evidence "was not relevant as it was not probative of any material fact in question relating to the murder" of K.J. "Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *State v. Putman*, 848 N.W.2d 1, 9 (Iowa 2014) (quoting Iowa R. Evid. 5.401). "The general test of relevancy is whether a reasonable [person] might believe the probability of the truth of the consequential fact to be different if [the person] knew of the proffered evidence." *Id.*

The State's first non-character purpose for seeking admission of the video was motive. In the prosecutor's view, the motive for the killing was a "sexual encounter gone wrong." Although motive is not an element of first-degree murder, it might be probative of malice aforethought, which is an element. *See State v. Caples*, 857 N.W.2d 641, 646 (Iowa Ct. App. 2014). "Malice aforethought" was defined for the jury as "a fixed purpose or design to do some physical harm to another which exists before the act is committed." The jury was further instructed malice aforethought did "not have to exist for any particular length of time." Most critically, the jury was instructed, "Malice aforethought may be inferred if the defendant or the person he aided and abetted used a dangerous weapon."

As noted, K.J. died of gunshot wounds. The bullets came from the "silver revolver" found in the red Impala. Several witnesses tied the revolver to Sanders-Galvez. The phone video added nothing to the question of whether Sanders-Galvez used a dangerous weapon, nor did it disclose other indicia of "a fixed purpose or design to do physical harm." The video was simply a childish attempt to capture a sex act. The video also showed Sanders-Galvez momentarily turning the camera on himself. But neither his laughing expression nor his limited commentary presaged the gruesome acts that followed.

We recognize K.J. sometimes dressed as a female, identified as a female on a Facebook page, was given several bras by A.W., was wearing a bra on the night of the killing, and had bleach poured on his genital area. These facts supported the State's theory of a sexual encounter gone wrong. But the phone video did not. To extrapolate a purpose to abduct K.J., confine him in an upstairs room, have sex with him, envelope his head in a bag to the point of near

suffocation, move him to an alley, pour bleach on him, and shoot him because the sexual encounter "went wrong" is to read too much into the twenty-five second video. We conclude the phone video was irrelevant on the question of Sanders-Galvez's motive to kill.

The video also was not required to establish Sanders-Galvez's connection to the co-defendant or the location of the crime. The State established both through Hy-Vee surveillance video and the testimony of law enforcement officers and friends. Indeed, one of the friends' description of the home's interior, including a spiral staircase leading up to the bedroom, lays to rest the assertion that the video was needed to confirm those details. As for the State's claim that the video showed the co-defendants' comfort with having sex in front of each other, sexual activity in or out of each other's sight was not a legitimate disputed issue in the case. Sanders-Galvez was not charged with sexual abuse of K.J. and, as noted, the "sexual-encounter-gone-wrong" motive for the killing was not well-developed. Because the phone video was irrelevant to a legitimate disputed issue, the evidence was inadmissible.

Our analysis cannot end here because "[e]rror in admission of evidence must be prejudicial to an accused to constitute cause for reversal." *State v. Liggins*, 524 N.W.2d 181, 188 (Iowa 1994). "When an error is not of constitutional magnitude, the test of prejudice [for harmless-error purposes] is whether it sufficiently appears that the rights of the complaining party have been injuriously affected or that the party has suffered a miscarriage of justice." *State v. Traywick*, 468 N.W.2d 452, 454–55 (Iowa 1991). In applying this test, we ask whether "the same evidence is otherwise supplied by the defendant or is made overwhelmingly

clear in the record." *State v. Trudo*, 253 N.W.2d 101, 107 (Iowa 1977). As discussed, the State supplied evidence independent of the video on the location of the crime and Sanders-Galvez's relationship to the co-defendant. Because the evidence entered the record through other sources, we conclude the erroneous admission of the phone video amounted to harmless error.

## IV.    *Constitutionality of Sanders-Galvez's Sentence*

In *State v. Sweet*, 879 N.W.2d 811, 839 (Iowa 2016), the supreme court held, "[A] sentence of life without the possibility of parole for a juvenile offender violates article I, section 17 of the Iowa Constitution." Sanders-Galvez argues "the principles of *Sweet* should be expanded to juveniles [twenty-one] and younger."

The Iowa Supreme Court has drawn a line at eighteen. *See State v. Lyle*, 854 N.W.2d 378, 395 (Iowa 2014) ("[O]ur holding [that a mandatory minimum sentencing schema, like the one contained in section 902.12, violates article I, section 17 of the Iowa Constitution] today has no application to sentencing laws affecting adult offenders. Lines are drawn in our law by necessity and are incorporated into the jurisprudence we have developed to usher the Iowa Constitution through time. This case does not move any of the lines that currently exist in the sentencing of adult offenders."). This court has paid heed to the limitation.[3] We decline Sanders-Galvez's invitation to expand *Sweet*.

---

[3] *See, e.g.*, *Swan v. State*, No. 17-0877, 2018 WL 6706212, at *3 (Iowa Ct. App. Dec. 19, 2018); *State v. Hall*, No. 17-0570, 2018 WL 4635685, at *5 (Iowa Ct. App. Sep. 26, 2018); *Nassif v. State*, No. 17-0762, 2018 WL 3301828, at *1 (Iowa Ct. App. July 5, 2018); *State v. Wise*, No. 17-1121, 2018 WL 2246861, at *3 (Iowa Ct. App. May 16, 2018); *Smith v. State*, No. 16-1711, 2017 WL 3283311, at *3 (Iowa Ct. App. Aug. 2, 2017); *Thomas v. State*, No. 16-0008, 2017 WL 2665104, at *2 (Iowa Ct. App. June 21, 2017); *Schultz v. State*, No. 16-0626, 2017 WL 1400874, at *1 (Iowa Ct. App. Apr. 19, 2017); *Kimpton v. State*, No. 15-2061, 2017 WL 108303, at *3 (Iowa Ct. App. Jan. 11, 2017); *State v. Davis*, No. 15-0015, 2015 WL 7075820, at *1–2 (Iowa Ct. App. Nov. 12, 2015) (collecting cases;

We affirm Sanders-Galvez's judgment and sentence for first-degree murder and preserve his ineffective-assistance-of-counsel claim concerning the admission of hearsay evidence for possible postconviction relief.

**AFFIRMED.**

---

*State v. Vance*, No. 15-0070, 2015 WL 4936328, at *2 (Iowa Ct. App. Aug. 19, 2015) (collecting cases); *State v. Clayton*, No. 13-1771, 2014 WL 5862075, at *6 (Iowa Ct. App. Nov. 13, 2014).