# IN THE COURT OF APPEALS OF IOWA

No. 22-0614
Filed August 9, 2023

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**JOSHUA LEE ADAMS,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Polk County, Scott J. Beattie, Judge.


A defendant appeals his convictions for murder in the first degree.
**AFFIRMED.**


Martha J. Lucey, State Appellate Defender, and Mary K. Conroy, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Anagha Dixit, Assistant Attorney General, for appellee.


Heard by Ahlers, P.J., Badding, J., and Doyle, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**BADDING, Judge.**

Joshua Adams, a schizophrenic who was "consistently inconsistent" in his delusion that his mom and uncle were imposters, appeals from his convictions for their murders. He claims the "evidence presented at the bench trial proved, by a preponderance of the evidence, that [he] was legally insane at the time" of the murders. We affirm.

I.      **Background Facts and Proceedings**

Joshua Adams was described by his neighbors as "very odd." He liked to dress up in "Mortal [K]ombat outfits, police detective outfits, wear badges," and play with nunchucks in the yard of the home that he shared with his mom, Tracy. Adams claimed that he was a ninja and a member of the Green Berets. And he thought that he was married to Paris Hilton and Ivanka Trump. At other times, he claimed to be the President of the United States, an Olympic gold medalist, a supermodel, a Hollywood actor, and the son of God.

Adams was diagnosed with schizophrenia in 2004, after he reported hearing voices. He was hospitalized in 2009 and 2012 and prescribed antipsychotic medication. Adams said that he was good about taking his medication because it made his "brain feel better," but toward the end of December 2018, his prescription ran out.

On December 28, Tracy was getting ready to leave their home and pick up her brother, Gaylord, from work because he did not have a car. The two planned to go to a Christmas party later that evening. Adams argued with Tracy before she left because he was upset that she was giving Gaylord so many rides. Before leaving the house, Tracy asked her neighbor to fill up her tires. He did so and

Tracy headed out around 3:00 p.m.  When she and Gaylord got back home, Tracy thanked her neighbor and chatted with him for a few minutes before going inside the house after her brother.

Less than ten minutes later, Adams was at his neighbor's front door, pounding to be let in.  The neighbor's girlfriend opened the door and saw Adams "completely covered in blood from his hands to his elbows."  His sweatshirt was soaked in blood, his flannel pajama bottoms were ripped, and he was not wearing any shoes in the cold December weather.  Adams asked the neighbor for help and some water.  The neighbor, who had seen Adams drop a knife in the neighbor's yard on his way over, questioned: "What happened?  You just kill your mom?" Adams responded, "That ain't my mom."[1]

The neighbor's girlfriend called the police.  While she was on the phone, Adams walked back to his house and sat down in a swing outside.  The neighbor followed him and asked again, "What's going on[?] . . . .  I was just talking to your mom."  Adams answered, "Oh, they come at me."  The neighbor said that Adams then "pretty much said he stabbed them."  A bit later, Adams started looking at the neighbor "weird," prompting the neighbor to tell him: "Dude, I ain't your mom.  I'll fucking kill you . . . if you come at me."  At that, Adams took off running down the street.  The neighbor chased him until they reached a police vehicle arriving at the scene.

---

[1] Immediately after the murders, the neighbor told the police twice that Adams made this statement—in a police vehicle on his way to the station for a witness interview and during the interview itself.  And his girlfriend reported that statement to the 911 dispatcher during her call for help.  But by the time they testified at trial more than two years later, neither remembered Adams saying, "That ain't my mom."

Adams ran up to the vehicle and tried to open the door, while pointing at the neighbor and saying, "Shoot him, shoot him." The neighbor pointed back and said, "No. It's him." Seeing that Adams was "covered in blood head to toe," the police officer ordered Adams to the ground and handcuffed him. The officer then placed Adams in the back of his police vehicle before he and another officer went into the house where they found Tracy and Gaylord, stabbed to death. In the neighbor's yard, officers recovered a broken knife handle and blade. On the steps leading into Tracy's home, they found another knife handle. Inside, they located a third knife handle on the couch in the living room next to Tracy's body and another blade underneath Gaylord's body. In all, Adams used three knives during the stabbings, grabbing new ones from a kitchen drawer when the ones he was using broke.

Several hours after the murders, Adams was interviewed by two detectives. At the start, when one of the detectives asked him what happened, Adams said, "Do I have to tell you that?" Later, Adams told the detectives, "If I talk too much about it, it is not a good thing." But with some prompting, Adams told them about the argument he had with his mom before she left to pick up Gaylord. When she came back, Adams said he was waiting in the house with a fish knife. He told the detectives that she was telling him things that "were the opposite of what" he wanted to hear and that she was "not [his] mom" but a "lady that was acting like [his] mom." When asked who was with his mom, Adams answered, "Supposed to be my uncle but it's not my uncle." One of the detectives asked, "What do you mean?" Adams explained: "It's a guy that looks like my uncle . . . . but it's not my uncle." He later described him as some kind of "Gaylord lookalike." Toward the middle of his interview, Adams said he "knows for a fact" that it wasn't his mom or

uncle because "they were all dead by now." And then he claimed to be the President of the United States.

After some more questioning, Adams explained that after his mom got home, she got "psycho" and "crazy" with him. She told him that her ex-boyfriend was coming over. This upset Adams, who did not like the ex-boyfriend because he made his mom cry. He told the detectives that his mom told him to "go for it," referring to the knife in his hand. So Adams said that he "gripped up" and started stabbing his mom. She fell and yelled at him to stop, but he kept stabbing her. Gaylord came out from a back bedroom to help his sister, but Adams started stabbing him too. At some point, the blade on the knife broke. Adams went to the kitchen, got another knife, and kept stabbing Gaylord. Then the second knife broke, so Adams got another one from the kitchen and stabbed Gaylord some more. When that one broke, Adams said that he left and went to the neighbor's house to ask for help. By the time Adams was done, Tracy had twenty-three stab wounds, while Gaylord had more than nineteen.

The State charged Adams with two counts of murder in the first degree. The month after the murders, Adams's cousin visited him at jail. When his cousin asked Adams if he knew why he was in jail, Adams answered, "I stabbed my mom and Gaylord." But later in the visit, Adams asked, "Are they still alive somehow?" When his cousin replied, "You killed them. They're dead," Adams questioned, "Is there still a Tracy and Gaylord running around?"

Soon after that visit, defense counsel applied for a competency evaluation. The court suspended the proceedings and ordered treatment to restore Adams's competency. The proceedings resumed a couple of months later, although even

with medication, Adams was still experiencing some delusions. In a phone call with his grandma in August 2020, Adams said, "When I stabbed my mom, you know, it wasn't my mom. It was a robot."

Adams filed a notice that he intended to rely on the defense of insanity.[2] The case proceeded to a bench trial in July 2021, following which the district court rejected Adams's insanity defense and found him guilty as charged.

## II. Standard of Review

Challenges to the sufficiency of the evidence are reviewed for correction of errors at law. *State v. Brimmer*, 983 N.W.2d 247, 256 (Iowa 2022). "In a bench trial, we review the district court's findings as we would a jury verdict, meaning we will affirm the verdict if supported by substantial evidence." *State v. Belk*, No. 21-1742, 2022 WL 10861390, at *2 (Iowa Ct. App. Oct. 19, 2022); *accord State v. Myers*, 924 N.W.2d 823, 827 (Iowa 2019). "Evidence is substantial if it could convince a rational trier of fact the defendant is guilty of the crime charged beyond a reasonable doubt." *State v. Jacobs*, 607 N.W.2d 679, 682 (Iowa 2000).

## III. Analysis

In Iowa, a defendant cannot be convicted of a crime

> if at the time the crime is committed the person suffers from such a diseased or deranged condition of the mind as to render the person incapable of knowing the nature and quality of the act the person is committing or incapable of distinguishing between right and wrong in relation to that act.

Iowa Code § 701.4 (2018). The defendant bears the burden of proving this defense by a preponderance of the evidence. *See id.*

---

[2] The notice also included the defense of diminished responsibility, though Adams did not pursue that defense at trial.

The only contested issue at trial was whether Adams met that burden. And that issue depended on the testimony of two expert witnesses—Dr. Tracy Thomas for the State and Dr. Steven Bruce for the defense. These experts agreed that Adams suffered from a diseased or deranged condition of the mind when he murdered his mom and uncle. They both diagnosed him with schizophrenia and Capgras syndrome—"a fairly rare component of schizophrenia." Dr. Bruce explained that the condition, which is also known as "imposter syndrome," is "a syndrome in which somebody believes that—usually somebody close to them—a parent, spouse, a family member—has been replaced by a duplicate, an imposter, in their place." Where the experts parted ways, however, was with the next two prongs of the insanity defense—whether Adams's mental condition rendered him incapable of knowing the nature and quality of the act he committed or distinguishing between right and wrong in relation to that act. *See id.*

In addressing those prongs, Dr. Bruce zeroed in on Adams's delusions, testifying that in his twenty-five years of experience in forensic and clinical settings, he had "never encountered somebody who had such significant delusions." He concluded that because of those delusions, Adams did not understand the nature and quality of his acts—that he was stabbing his mom and uncle—and could not tell right from wrong. As support for this conclusion, Dr. Bruce pointed to Adams's actions after the murders, noting that he made no effort to hide what he did. *Cf. State v. Stowe*, No. 21-0080, 2022 WL 2826025, at *2–3 (Iowa Ct. App. July 20, 2022) (detailing the defendant's actions to cover up the murder of his grandmother in affirming the district court's rejection of his insanity defense). Instead, Adams left the murder weapons in plain sight, went to the neighbor's

house covered in blood, calmly sat in a swing outside the crime scene, and ran to a police vehicle for help.

Dr. Bruce testified that Adams's use of multiple knives was irrelevant because of his delusion that his mom and uncle were already dead and had been replaced by imposters. Along those same lines, Dr. Bruce did not attach significance to Adams's claims of self-defense because "[i]f he believes that they're imposters and robots and that . . . there's a conspiracy against him, then" it would make sense that he had a "mindset of 'I have to attack first to protect myself.'" As far as Adams's reluctance to talk with the detectives during his interview, Dr. Bruce testified that was a "manifestation of his paranoia" that "others were listening." And Dr. Bruce said there was "zero evidence, zero basis in fact, zero research" to support a claim that people who cannot distinguish between right and wrong are typically "indignant and surprised that they're being arrested." He also pointed out that Adams *is* "very upset and indignant" in the video of him in the holding cell after the murders, demanding "over and over again" for the handcuffs to be taken off because he is the President of the United States.

Dr. Thomas looked at these same facts and interpreted them differently. She testified that when she asked Adams why he went to the neighbor's house, "he indicated, well, I had just killed my mom and uncle and I didn't have anywhere to go, I was in bare feet, and I needed somebody to call the police because that's what you do in an emergency." That, to her, showed Adams's knowledge that his act was "legally wrong," as did his claim of self-defense and lack of surprise at being arrested. *See State v. Hamann*, 285 N.W.2d 180, 183 (Iowa 1979) (stating the words "right" and "wrong" under our statute's codification of the *M'Naghten* rule

of insanity "should be understood in their legal and not in their moral sense"). On the last issue, Dr. Thomas noted that while Adams was saying he was the President in the holding cell video, she "didn't hear him saying something like, 'How can you arrest me for being the President?' or, 'How can you arrest me? I killed a robot. I've done a good deed.'"

Unlike Dr. Bruce, Dr. Thomas thought Adams's use of multiple knives was significant:

> [A]n individual that did not understand the nature of their behavior—so . . . someone who didn't know that they were using a knife and stabbing someone—would be unlikely to go back three different times to get three different knives to keep stabbing an individual. So that indicated to me that he knew what he was doing.
>
> In terms of quality . . . I'm looking at whether someone knows the likely outcome of their behavior. In this case, stabbing someone would lead to them being significantly harmed or killed. He made numerous statements saying, "I kept stabbing her. She was dying." He—in regards to his uncle, he said, "He kept fucking around, so I kept stabbing him." So there were multiple statements to multiple people that he was stabbing them in order to get them to stop or to die, that he knew they were dying, and he continued to stab them. So that all indicates knowledge of nature and quality.

As for Adams's delusion that his mom and uncle were imposters, Dr. Thomas testified:

> [B]asically from the time he was arrested until he talked to me I think he was consistently inconsistent in terms of that delusion. So there were times that he would call his mom and uncle "mom" and "uncle" or "uncle Gaylord." There were other times that he would say, "But I don't think that's who they were," or they were imposters.

His flexibility with the delusion was one of the data points that led Dr. Thomas to conclude that he was capable of knowing the nature and quality of the act he committed and distinguishing between right and wrong. *See State v. Dye*, No. 08-0887, 2009 WL 3337617, at *4 (Iowa Ct. App. 2009) (rejecting defendant's

insanity defense where the evidence showed that, while he "may have suffered from a mental illness, there were, at a minimum, periods of time during which [his] mental illnesses did not impair his ability to think rationally"). But, she testified, "even if . . . we all wanted to agree that he thought they were imposters, I would still say he knew that he was stabbing people . . . and killing them." *See Villanueva v. State*, No. 01-20-00303-CR, 2021 WL 2832974, at *13 (Tex. Ct. App. July 8, 2021) (finding that a defendant, who had Capgras syndrome, referring to those she harmed as her "daughter" and "father-in-law" was "some evidence that she understood they were her family members, which the jury reasonably could have concluded was inconsistent with [an expert's] opinion that [she] did not think these were real people and therefore did not understand that her attacks were illegal").

Finally, Dr. Thomas criticized Dr. Bruce's report because

> [h]e went from "Mr. Adams has schizophrenia" to basically, "He didn't know the nature and quality of his actions and couldn't distinguish right from wrong." And I didn't see an analysis of the things, like what happened at the crime scene or what the different records said or his behavior during the interview with the detectives. That kind of interpretive section wasn't there, so I wasn't sure how he came to those conclusions.

The district court found this critique compelling, ruling that while both experts were "qualified and credible," Dr. Thomas "most appropriately framed her opinion consistent with the current law of insanity." The court continued:

> Dr. Bruce's opinion failed to address the question correctly within the State's case law context. Specifically, Dr. Bruce takes a broad view of the statute, generally equating a mental disability and delusion with legal insanity. Iowa courts, however, have taken a narrow view of the statute. This narrow view was articulated well by Dr. Thomas, and in this case, she appropriately applied the facts to the law.

(Footnote omitted.)  *Accord State v. Venzke*, 576 N.W.2d 382, 385 (Iowa Ct. App. 1997) (affirming trial court's conclusion that a schizophrenic defendant's "delusions and hallucinations were not sufficiently severe as to render him insane" under our statute).

In line with Dr. Thomas's opinion, the court found the greater weight of evidence showed Adams did know the nature and quality of his acts:

> The evidence indicates that he knew that he was stabbing an individual with a knife.  In the interviews with the police officers immediately after the incident, Adams repeatedly referred to the fact that he had stabbed his mother and uncle.  As discussed by both experts, Adams used three different knives to attack and kill Tracy and Gaylord.  He returned twice to the kitchen drawer to retrieve another knife after one broke.  The use of three knives indicates that he knew that what he was doing was stabbing and that a knife was necessary.  Likewise, Adams indicated that he prepared for his confrontation with Tracy by arming himself with a knife.
> . . . . He referred to the fact that [his mom] begged him to "stop," and he continued.  He also explicitly referred to the fact that she was "dying" as he stabbed her.  Likewise, in reference to Gaylord, Adams . . . . referred to the fact that Gaylord attempted to "stop some shit, and his ass got stabbed too."  Again, these statements indicate that Adams knew that his actions would result in the death of the individuals he stabbed.

As for Adams's ability to distinguish right from wrong, the court concluded that he

> did know the wrongness of his actions.  Initially, this can be seen by the fact that the defendant told his neighbors that he was attacked by his mother and was acting in self-defense.  While he stayed at the scene of the incident, he ran when sirens were heard approaching the scene.  He attempted to blame his neighbor by telling the police officer to "shoot him."  Importantly, when the police initially interviewed him, Adams stated that he did not want to describe what he had done because "if he talked too much, it was not a good thing."  Finally, as Dr. Thomas points out, Adams was not surprised or shocked when he was informed that he was being placed under arrest.  While it is true that many of these things could be interpreted differently, the Court believes the most logical and consistent

interpretation of his statements and actions are that he knew what he was doing was wrong.

On appeal, Adams urges a different interpretation of the facts outlined above. For instance, Adams points out that he called his mom and uncle "robots" after the murders, which he says shows "that he did not believe he had stabbed or killed a human being." But, as the district court found, the first time Adams made that reference was in an August 2020 call with his grandma—well after the murders occurred. *See State v. Davis*, 951 N.W.2d 8, 20 (Iowa 2020) ("Sanity is judged at the time of the offense."). In any event, our ultimate task is to determine whether the evidence supports the findings actually made, not whether it would support the contrary findings urged by Adams. *See Belk*, 2022 WL 10861390, at *2 (citing *State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021)). Upon reviewing "all the evidence and the record in the light most favorable to the trial court's decision," we conclude substantial evidence supports the findings the court made in rejecting Adams's insanity defense. *See Myers*, 924 N.W.2d at 827 (citation omitted).

As for Adams's complaints about the court's evaluation of the experts, "[w]hen conflicting psychiatric testimony is presented to the fact finder, the issue of sanity is clearly for the fact finder to decide." *Jacobs*, 607 N.W.2d at 685. The district court, as the trier of fact, "is not obligated to accept opinion evidence, even from experts, as conclusive." *Id.* "When a case evolves into a battle of the experts," as this one did, "we, as the reviewing court, readily defer to the district court's judgment as it is in a better position to weigh the credibility of the witnesses." *Id.*

Because it was the district court's prerogative to weigh the expert opinions, we affirm the court's findings on those experts, its conclusion on the insanity defense, and Adams's convictions for the first-degree murders of his mother and uncle. *See Stowe*, 2022 WL 2826025, at *3 (affirming the district court's decision to credit one expert opinion that the defendant was not insane over two differing expert opinions).

**AFFIRMED.**