# IN THE COURT OF APPEALS OF IOWA

No. 21-0247
Filed November 2, 2022

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**CHAD MICHAEL VICE,**
Defendant-Appellant.
_____

Appeal from the Iowa District Court for Lee (North) County, Michael J. Schilling, Judge.

A defendant appeals his convictions for first-degree burglary and assault while participating in a felony. **AFFIRMED.**

Erin M. Carr of Carr Law Firm, P.L.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Genevieve Reinkoester, Assistant Attorney General, for appellee.

Heard by Tabor, P.J., and Schumacher and Chicchelly, JJ.

**TABOR, Presiding Judge.**

A case of mistaken identity: that's what Chad Vice calls his convictions for first-degree burglary and assault while participating in a felony. Vice contends the district court should not have given any weight to the victim's identification of him in a faulty photo array. He also challenges the admission of an out-of-court statement by his cousin placing him near the crime scene.[1]

Viewing the evidence in the light most favorable to the district court's ruling and giving due deference to its credibility findings, we find substantial evidence that Vice committed these crimes. We agree with Vice that the court should have sustained his hearsay objection. But we find the State overcame the presumption of prejudice from that hearsay. Thus, we affirm his convictions.

## I. Facts and Prior Proceedings

On a May morning in 2019, Julie drove to her ex-husband's house to pick up their teenage daughter. She texted her daughter that she was parked outside. A few minutes later, still looking down at her phone, in her peripheral vision Julie saw a figure approaching. Assuming it was her daughter, Julie unlocked the car doors so she could get into the passenger side. But the person came to the driver's door instead.

Looking up, Julie saw "a very angry person." The man opened her car door with one hand and brandished a switchblade in the other. From two feet away, the intruder yelled "fucking piece of shit" as he lunged at her with the blade, aiming for

---

[1] Vice also mentions a potential ineffective-assistance-of-counsel claim. But such claims cannot be decided on direct appeal from a criminal proceeding and need not be preserved for postconviction relief. Iowa Code § 814.7 (2021).

her neck. Julie screamed and dropped her phone, prompting the man to look at her and pull away. His demeanor changed, he apologized, and said she was the "wrong person." In that moment, Julie thought the man looked familiar. The man then fled behind a neighboring house as Julie yelled: "Are you fucking kidding me?"

Julie ran into her ex-husband's house and locked the door. Her daughter was still inside and Julie told her to call 911. While waiting for police to arrive, Julie and her daughter saw a man dressed in jeans and a black sweatshirt leave the house next door. Her daughter filmed the man on her phone as he walked to a maroon truck and drove away. Neither Julie nor her daughter saw his face.

Once Officer Dustin Fullhart arrived, Julie recounted what happened and described her attacker as wearing a black hoodie, jeans, and a gray hat.[2] She also recalled that his eyes looked "a silver bluish" but "darker like he was mad." From the ten to fifteen seconds that she had to look at his face, Julie recalled the "chiseledness of his jaw line" and that his "jaws were clenched." Julie said he "wasn't clean shaven," and instead had "scraggily" salt-and-pepper facial hair, adding to an overall "disheveled" look. She originally thought the man might be her ex-husband's brother, but soon realized it was not. She then assumed the man who just left the neighbors' house was the attacker.

After talking to Julie, Officer Fullhart looked behind the house next door but did not find the suspect or evidence of the attack. He spoke to that house's occupants: Lynsey Gilpin, his wife, their daughter, and a family friend. None of

---

[2] At trial, Julie testified the man was wearing a grey hoodie instead.

them matched Julie's description of the assailant and none recalled that anyone left their house.

When the officer returned to Julie, he viewed her daughter's phone video of the man leaving the neighbors' house. Julie also provided the plate number of the maroon truck. Equipped with that video, Fullhart returned to the Gilpin residence to ask again if anyone had left the house. Lynsey Gilpin *then* remembered that Kane Simmons left just before law enforcement arrived. Gilpin described Simmons as "unstable" and "a little bit crazy." The family provided Simmons's phone number and told the officer where he was headed. Before leaving, Fullhart told them to call police if Simmons returned.

After Fullhart left, Gilpin went to the detached garage behind his house. Inside, he saw a man hiding in the garage attic. While no lights were on, Gilpin testified he was "seventy-five percent" sure it was his cousin, Vice.[3] Startled, Gilpin told the person in the attic he planned to call the police. When Gilpin left to call 911, the man ran off. When he connected with Officer Fullhart by phone, Gilpin reported seeing Vice in his attic. It was then that the course of the investigation changed with Vice becoming the prime suspect. Police returned to the crime scene to search for Vice but did not find him. Fullhart also talked with Simmons on the phone that day but ruled him out as a suspect based on their conversation, as well as Gilpin placing Vice at the scene and Julie's photo identification.

That same day, Officer Fullhart compiled a photo lineup to see if Julie could identify her assailant. The lineup included six men, ages nineteen to forty-three

---

[3] Gilpin and Vice hung out weekly, and Vice had been in his garage before.

years old, with Vice being the oldest. Each man appeared in two mugshots, one facing forward and one profile, except for Vice who only had a forward-facing photo. The lineup did not include a photo of Simmons. Fullhart met with Julie at her home and gave her the photos all at once to see if she recognized anyone. He told her the assailant may or may not be in the array. After studying the photos, Julie pointed to the single image of Vice as the man who assaulted her. This exchange was not recorded. Officer Fullhart recalled that after Julie picked that photo, he mentioned the name Chad Vice. Julie couldn't remember which of them said Vice's name first. But she then recognized Vice because they went to high school together, though she had not seen him in ten to fifteen years.

After the photo identification, Fullhart interviewed Vice. Vice acknowledged knowing Julie but denied assaulting her. Vice said that he did not know where he was during the assault, blaming blackouts caused by diabetes and "not eating right." He conceded his health condition sometimes made him "wacky" and angry. Officers arrested Vice two days later.

The State charged Vice with first-degree burglary and assault while participating in a felony. While in jail, Vice placed eight phone calls during the month of June, trying to craft an alibi through an acquaintance named Tara: "I don't know what I got to say to convince her to help me but I'm thinking I could promise her some money. . . . She's a liar so what the fuck. You might as well get paid for your lies." In one of the calls, Vice admitted hiding in Gilpin's garage attic, and Gilpin telling him, "you can't be here," but claimed it was two days before the assault, and the authorities had their timeline mixed up.

Pretrial, Vice's attorney engaged in discovery. Only after being deposed did Officer Fullhart show Julie two photographs that he believed to be of Simmons. She did not recognize Simmons and thought the photos were of two different people. Fullhart acknowledged that the two images looked "very different" and he was not "quite sure" whether both photos depicted Simmons.[4]

Vice waived his right to a jury and was tried by a judge. At the bench trial, three people testified. First, Julie identified Vice as the man who assaulted her. Second, Gilpin testified he was "seventy-five percent" sure he saw Vice in his attic, but gave somewhat conflicting statements on whether he or police brought Vice's name up first in the investigation. Third, Officer Fullhart explained his investigation.

After a back-and-forth of sustained hearsay objections, Fullhart said he developed a new suspect when Gilpin provided Vice's name. Vice objected to this statement as hearsay. But the court overruled the objection. Based on the evidence, the district court found Vice guilty of burglary in the first degree and assault while participating in a felony beyond a reasonable doubt. He now appeals.

## II. Analysis

## A. Substantial Evidence Identifying Vice

Vice contends the State failed to present substantial evidence that he was the man who attacked Julie. We review his challenge for legal error. *State v. Banes*, 910 N.W.2d 634, 637 (Iowa Ct. App. 2018). Our sufficiency review is the same for a bench trial as a jury trial. *State v. Myers*, 924 N.W.2d 823, 827

---

[4] One of the photos was from a driver's license and the other appeared to be a mug shot.

(Iowa 2019). The court's findings of fact have the effect of a special verdict—binding on appeal if supported by substantial evidence. *State v. Fordyce*, 940 N.W.2d 419, 425 (Iowa 2020). We view the record in the light most favorable to the court's decision. *Myers*, 924 N.W.2d at 827. But evidence is not substantial if it creates no more than "speculation, suspicion, or conjecture." *State v. Chapman*, 944 N.W.2d 864, 871 (Iowa 2020). And "[i]dentity is an element of a criminal offense which the State must prove beyond a reasonable doubt." *State v. Jensen*, 216 N.W.2d 369, 374 (Iowa 1974).

The State relied on Julie's identification of Vice as the linchpin of the prosecution. She picked Vice from a photo array after Gilpin reported seeing Vice in his garage. So those two eyewitness identifications formed the core of the case. On top of those identifications, the State offered Vice's jail calls seeking help in creating an alibi.

Vice now highlights weaknesses in the State's case. He points to the lack of physical evidence tying him to the crime and the State's failure to thoroughly investigate Simmons as an alternative suspect. And to explain the jail calls, Vice contends he was searching for Tara to help determine where he was during the assault because he blacked out from his medical condition.

But Vice devotes most of his argument to questioning the reliability of Julie's identification.[5] He notes that she had only seconds to see her attacker. She was inconsistent in her impressions, thinking at first the man was her ex-husband's

---

[5] Vice also critiques Gilpin's identification, noting that at trial Gilpin was evasive about whether the officers suggested he look for Vice or if he brought up his cousin's name after seeing him in the attic.

brother and then believing it was the man who drove away from the scene. She also changed her mind about the color of the attacker's clothing.

As his main challenge, Vice takes aim at the photo array compiled by Fullhart, arguing that it was impermissibly suggestive and failed to use the best practices outlined by our supreme court in *State v. Booth-Harris*, 942 N.W.2d 562, 573 (Iowa 2020). For instance, Officer Fullhart both prepared and administered the photo lineup, the lineup made Vice stand out since he was depicted in only a single photo, and the men in the other photos were much younger than him. He contends Fullhart's confirmation that Vice was their suspect after Julie identified him "inflated her confidence" to a degree that prevented her from recognizing an alternative suspect months later when Fullhart showed her two photos, ostensibly, of Simmons. Vice claims the suggestive photo array rendered Julie's identification unreliable and that we should exclude it from our substantial-evidence analysis.

The State counters that Vice is conflating a ground to suppress the photo array as impermissibly suggestive, which he did not pursue at trial, with his appellate challenge to the sufficiency of the evidence. Vice did not move to suppress the photo array, did not object to the photos as trial exhibits, and did not object to the officer's testimony about his preparation of the array nor to Julie's positive in-court identification. *Contrast Booth-Harris*, 942 N.W. at 570 (analyzing motion to suppress which alleged that identification procedure was impermissibly suggestive and suggestive procedure led to "very substantial likelihood of irreparable misidentification"). And because Vice made no pretrial effort to show

a very substantial likelihood of irreparable misidentification, the evidence was for the factfinder to weigh.  *See id.*

Those points are true.  Still, Vice was free to attack the credibility of Julie's identification at trial.  And he did so.  For example, on cross-examination, Julie acknowledged that she did not recognize the assailant as Vice, her high school acquaintance, until presented with the photo array.  It's just that the district court found her identification reliable despite the suggestive aspects of the photo array.  And we abide by the tenet that deciding credibility and giving appropriate weight to witness identifications are tasks better suited to the factfinder than an appellate court.  *See State v. Doolin*, 942 N.W.2d 500, 510–11 (Iowa 2020).

The district court was under no illusion about the strength of the State's case.  Rather, it observed: "Without question, law enforcement left some holes in the investigation."  The court also acknowledged that "the photo array may have been suggestive" but not unduly so.  The court then employed the uniform jury instruction to reach its conclusion that Julie's identification was reliable.[6]  The court

---

[6] In *Booth-Harris*, our supreme court found that counsel had no duty to object to the uniform instruction on eyewitness identification that considers four factors:

> 1. If the witness had an adequate opportunity to see the person at the time of the crime.  You may consider such matters as the length of time the witness had to observe the person, the conditions at that time in terms of visibility and distance, and whether the witness had known or seen the person in the past.
> 2. If an identification was made after the crime, you shall consider whether it was the result of the witness's own recollection.  You may consider the way in which the defendant was presented to the witness for identification, and the length of time that passed between the crime and the witness's next opportunity to see the defendant.
> 3. Any identification made by picking the defendant out of a group of similar individuals is generally more reliable than one which results from the presentation of the defendant alone to the witness.

highlighted Julie's career as a registered nurse, a profession that requires "above average skills of observation and attention to detail." The court also discussed her opportunity to see the attacker: she was within two feet of him, it was daylight, and she had an unobstructed view. She picked Vice out of the array the same day, while the incident was fresh in her mind and after the officer explained the attacker's photo may not be there. She ultimately recognized Vice from high school. And she identified him with confidence again in open court. The court also weighed her prior identification of Simmons as the assailant, but noted that she could not see Simmons's face in her daughter's phone video.

Beyond Julie's identification of Vice, the court found Gilpin's testimony that he saw his cousin in the garage attic as "credible and persuasive." Again, the court was not naïve about Gilpin's hesitancy to accuse Vice. Yet the court found "Gilpin's demeanor and word choices during his testimony at trial suggested strongly that he was trying to 'thread the needle' between giving honest testimony consistent with what he told law enforcement before trial and his obvious concern at trial of implicating his cousin in a serious crime that would send Vice to prison." We defer to that careful reasoning.

As a final gloss, we find support for Vice's convictions in his recorded jail calls. Despite his innocent explanation, the fact finder could infer that Vice's attempt to pay an acquaintance to fabricate an alibi went to his consciousness of guilt. *See People v. Morrison*, 368 N.E.2d 1325, 1328 (Ill. App. 1977).

---

4. Any occasion in which the witness failed to identify the defendant or made an inconsistent identification. 942 N.W.2d at 578.

All in all, the district court's findings were supported by substantial evidence and are binding on us. Viewing the record in the light most favorable to its decision, we find proof beyond a reasonable doubt that Vice committed first-degree burglary and assault while participating in a felony.

**B. Hearsay Challenge**

Vice next contends the district court erred in overruling his hearsay objection and allowing Officer Fullhart to testify about his conversation with Gilpin. The State asked Fullhart: "Why were you now looking for Chad Vice?" Fullhart responded: "That name was given to me by Lynsey Gilpin." The State contends the response was not hearsay because it was not offered for the truth of the matter asserted.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement. Iowa R. Evid. 5.801(c). Unlike most evidentiary issues, we review hearsay claims for legal error. *State v. Paredes*, 775 N.W.2d 554, 560 (Iowa 2009). That standard applies because trial courts have "no discretion to admit hearsay.'" *State v. Veverka*, 938 N.W.2d 197, 202 (Iowa 2020) (quoting *State v. Dullard*, 668 N.W.2d 585, 589 (Iowa 2003)).

Vice claims the State offered Fullhart's statement for its truth because the prosecutor wanted to bolster Gilpin's direct-examination testimony that he was the first to mention Vice after seeing his cousin in the garage attic. That testimony was impeached on cross-examination when defense counsel pointed out that Gilpin swore in his deposition: "I'd gone to my garage and opened up the attic and found someone standing or in there. I thought it was Chad Vice because the police had told me that's who they thought was there." Gilpin added that he did not remember

giving that answer and wasn't "exactly sure" if police told him to be on the lookout for Vice.

The State responds that Fullhart's statement was offered, not for its truth, but to explain the officer's subsequent conduct in returning to the crime scene and shifting his focus to Vice as the prime suspect.

To settle the parties' dispute, we consider what it means to offer a statement for its truth. "A statement that would ordinarily be deemed hearsay is admissible if it is offered for a non-hearsay purpose that does not depend upon the truth of the facts presented." *McElroy v. State*, 637 N.W.2d 488, 501 (Iowa 2001). In determining whether the statement is admissible, "we look 'at the *real* purpose for the offered testimony, not just the purposes urged by the prosecutor.'" *State v. Elliott*, 806 N.W.2d 660, 668 (Iowa 2011) (quoting *State v. Sowder*, 394 N.W.2d 368, 371 (Iowa 1986)). In making this determination, "we review the relevant record to determine if the purpose voiced by the State can reasonably be found to be the real purpose for which the challenged testimony was offered." *State v. Lee*, No. 00-1019, 2002 WL 100195, at *3 (Iowa Ct. App. Jan. 28, 2002). Posed differently, does the statement have value independent of the fact asserted therein? *State v. Huser*, No. 10–2067, 2011 WL 6079120, at *10 (Iowa Ct. App. Dec. 7, 2011).

If offered to prove responsive conduct, an out-of-court statement is relevant independent of its truth. *See State v. Mitchell*, 450 N.W.2d 828, 832 (Iowa 1990) (explaining statement by defendant's friend to victim was offered to show victim's response). But out-of-court statements offered to explain responsive conduct of police are not automatically admissible. *See State v. Dessinger*, 958

N.W.2d 590, 603 (Iowa 2021) (chronicling recent cases excluding statements that went "beyond mere fact that conversation occurred"). Our supreme court limits the scope of such evidence to "explaining why certain responsive actions were taken by officers." *State v. Bos*, No. 01-0132, 2002 WL 663644, at *2 (Iowa Ct. App. Apr. 24, 2002) (quoting *State v. Doughty*, 359 N.W.2d 439, 442 (Iowa 1984)).[7]

In arguing the State's real purpose for offering Fullhart's statement was for its truth, Vice notes that the State already offered Gilpin's testimony to explain law enforcement's return to the scene and subsequent investigation. Gilpin testified that he called Fullhart about finding a man in his attic he believed to be Vice. But despite securing that explanation of why the investigation turned to Vice, the prosecution was dogged in asking Fullhart to repeat Gilpin's out-of-court statements. The trial transcript is illuminating on this point. Before the court allowed the disputed statement, the defense repeatedly objected to the State's line of questioning on hearsay grounds and the court repeatedly sustained those objections:

> Q. As a result of that phone call to LEECOM, did you then return a phone call from Lynsey Gilpin? A. I did.
> Q. And what was the reason for that call? A. Well, he informed me—
> [The Defense]: Objection. The answer didn't call for hearsay, but he's answering it in a hearsay fashion.
> THE COURT: Well, it sounds like he's going to discuss what Mr. Gilpin told him. I don't think that was even the question that you asked. So why don't you ask a different question that can be answered either "yes" or "no" or some fashion that allows [the defense] to lodge an objection if he has one.

---

[7] *Doughty* explained that often officers will explain their conduct by saying they took action "upon information received," which is not objectionable. 359 N.W.2d at 442. But the danger in relaying more substantive information is that it may be misused by the fact finder. *Id.*

Q. Did Lynsey Gilpin inform you that he had found somebody hiding in his garage at that time?

[The Defense]: Objection. It calls for hearsay.

The COURT: Sustained.

. . . .

THE COURT: Isn't it already in the record that Mr. Gilpin called the police department to advise that he saw an individual in the attic of his garage? Didn't Mr. Gilpin testify to that? [The State]: He did testify to that.

THE COURT: So doesn't that explain why the officer changed the course of the investigation? [The State]: I suppose it does.

After that concession, the judge had the court reporter read back the last question in the record.

THE COURT REPORTER: "Question: Did Lynsey Gilpin inform you that he had found somebody hiding in his garage at that time?"

THE COURT: All right. You can answer that question either "yes" or "no."

THE WITNESS: Thank you, sir. Yes, he did.

THE COURT: Go ahead and ask your next question.

[The State]: Were you given a description of the individual that was found in Mr. Gilpin's garage? A: Yes.

Q. Did the description match the description that Julie had given you of that individual?

[The Defense]: Objection. Once again this is hearsay. . . .

THE COURT: The objection is sustained. . . .

Q. (By [the State]) Was this the first point in your investigation that name Chad Vice was brought up?

[The Defense]: Objection. That naturally implies that Mr. Gilpin brought it up.

THE COURT: Sustained. Ask another question.

Fullhart then testified that after Gilpin informed him of the individual in the attic he went back to the crime scene. This series of questions followed:

Q. Had you a new suspect at that point in time? A. Yes, sir.

Q. Who was your suspect? A. Chad Vice.

Q. Okay. Why were you now looking for Chad Vice? A. That name was given to me by Lynsey Gilpin.

[The Defense]: Objection. I move to strike that. It's almost like they're trying to impeach Mr. Gilpin because he was unclear—I shouldn't say "unclear." He was adamant, I believe, that he had got the name from the police. And so this is, I think, the State's attempt

to fix a major fall with their case, this is just calling for hearsay to try to fix that.

After the court overruled that last hearsay objection, Fullhart testified that before receiving the phone call from Gilpin he had no reason to suspect Vice's involvement.

The district court was correct in observing that Gilpin's testimony already explained Fullhart's responsive conduct. The State conceded as much at trial. That concession discredits the State's alleged non-hearsay purpose for Fullhart's repetition of this point. *State v. Vuong*, No. 02-2097, 2003 WL 22701354, at *2 (Iowa Ct. App. Nov. 17, 2003). In other words, the non-truth value of Fullhart's testimony is diminished because his conduct could be explained without resorting to the use of the out-of-court statement. *See State v. Maniccia*, 355 N.W.2d 256, 261 (Iowa Ct. App. 1984).

And even if Gilpin's out-of-court statement retained its non-truth value, a review of the record shows that explaining the officer's responsive conduct was not the State's *true* purpose in offering this testimony. The prosecutor was intent on eliciting the contents of Fullhart's conversation with Gilpin to reinforce Gilpin's assertion on direct examination that he was the first to bring up Vice. Thus, Fullhart's repetition of Gilpin's statement was not offered to explain his subsequent investigation. Rather, the out-of-court statement was offered for its truth—the officer received the suspect's name from Gilpin, which avoided the inference that Gilpin's identification of Vice may have been confirming the identity of a suspect already on the police radar.

Having found the court improperly admitted the hearsay statement, we turn to the question of prejudice. We presume improper admission of hearsay is prejudicial unless the record shows otherwise. *State v. Plain*, 898 N.W.2d 801, 810 (Iowa 2017).

The State argues the admission was harmless because the information offered by Fullhart was cumulative of evidence already in the record from Gilpin. *See State v. Newell*, 710 N.W.2d 6, 19 (Iowa 2006) ("[E]rroneously admitted hearsay will not be considered prejudicial if substantially the same evidence is properly in the record."). The State also underscores that the error occurred in a bench trial, reducing any risk of prejudice because a judge, equipped with legal training, determined Vice's guilt.

Neither argument is satisfying. That the evidence is cumulative is a two-edge sword. On one edge, because the out-of-court statement repeated Gilpin's in-court statement, the State did not need it to explain Fullhart's responsive conduct. On the other edge, the factfinder already heard that Gilpin was the first to introduce Vice's name into the conversation. Further, even cumulative hearsay may be prejudicial if witness credibility is central to the case and the evidence is used to bolster that credibility. *State v. Elliott*, 806 N.W.2d 660, 670 (Iowa 2011). And as for it being a bench trial, the court found: "Gilpin called captain Fullhart and informed him that he found a man he knew to be Chad Vice in the attic of his detached garage." Thus, we cannot assume the district court gave no weight to the hearsay. *See State v. Matheson*, 684 N.W.2d 243, 244 (Iowa 2004).

Still, Fullhart's disputed testimony did not change the trajectory of the case. Both Gilpin and Fullhart testified that Gilpin reported seeing Vice in his attic.

Granted, Gilpin was not one-hundred percent sure on the stand that it was Vice. And he was impeached on cross-examination with his deposition testimony. But the hearsay did not contradict the core of Gilpin's testimony. Plus, Fullhart testified without objection that he never brought up the name, Chad Vice, and had no reason to suspect his involvement until Gilpin's phone call. And Vice fails to connect the debate over who mentioned his name first with the overall reliability of Gilpin's identification. So even if the officer told Gilpin to watch for Vice, it does not erase the fact that Gilpin indeed called Fullhart to tell him that he spotted his cousin hiding in the attic.[8]

In the end, the erroneously admitted hearsay was not prejudicial because it was not central to the identification issue and was cumulative to other testimony from Fullhart admitted without objection. *See State v. Johnson*, 272 N.W.2d 480, 483 (Iowa 1978) (finding hearsay harmless when "independent sources of the same line of testimony" came into the record without objection). Thus, we affirm Vice's convictions.

**AFFIRMED.**

---

[8] Vice contributes to the credibility of that report by acknowledging in a jail call that he indeed did hide in the Gilpin's garage attic, just on a different occasion.