# IN THE COURT OF APPEALS OF IOWA

No. 21-1718
Filed July 26, 2023

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**TODD RICKY JENKINS,**
        Defendant-Appellant.
_____

Appeal from the Iowa District Court for Linn County, Fae Hoover Grinde, Judge.

A defendant appeals his convictions for first-degree murder and going armed with intent. **AFFIRMED.**

Karmen Anderson, Des Moines, for appellant.

Brenna Bird, Attorney General, and Timothy M. Hau, Assistant Attorney General, for appellee.

Heard by Ahlers, P.J., Badding, J., and Mullins, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2023).

**BADDING, Judge.**

A love triangle with Todd Jenkins, his girlfriend Kiara Morrise, and Morrise's new boyfriend Reginald Ward came to a bloody end on October 30, 2019, when Jenkins shot Ward to death at a gas station in downtown Cedar Rapids. Jenkins fled the scene, ditched the gun, and was found five months later in an Illinois hotel room with Morrise. He was charged with first-degree murder and going armed with intent. Following a bench trial, the district court found him guilty as charged.

Jenkins appeals, claiming (1) the evidence was insufficient to prove the malice aforethought, deliberation, and premeditation elements of the murder conviction; (2) the State failed to prove beyond a reasonable doubt that his use of force was not justified; (3) the evidence was insufficient to support the intent-to-use and movement elements of his conviction for going armed with intent; and (4) the court abused its discretion in denying his motion for a new trial on weight-of-the-evidence grounds. We affirm.

I.      **Background Facts and Proceedings**

Todd Jenkins loved Kiara Morrise. According to Jenkins, they met in 2016 and dated until December 2019. Beginning sometime in 2018, Morrise was also dating Reginald Ward, though Morrise said that she and Jenkins had broken up before she started seeing Ward.

Jenkins and Ward had passing encounters with one another before the shooting. Morrise remembered one time when she was in a car with Ward, and he threw a taco at Jenkins's car—a white Audi. Jenkins recalled two other encounters. One happened after Jenkins dropped Morrise off at work when Ward, according to Jenkins,

pulled up on me, asked me what do you want to do, like what's up. I took it as a threat, but like I said, I told him . . . she's going to see the both of us, she's going to do what she does, so where do you want to go from here.

On another occasion, Jenkins testified that Ward drove up next to him, "flashed a gun," and followed him for a couple of blocks. One of Jenkins's friends testified that he became a hermit because of his problems with Ward, refusing to do anything outside the house. That friend described Morrise as toxic but said Jenkins's feelings for her "were very deep."

Sometime in October 2019, Jenkins sent Morrise flowers with a card that either read, "I love you," or "I miss you, Todd Rick." Admittedly "pissed off" that Morrise was with another man, Jenkins bought a new gun toward the end of October—a Glock 43 nine-millimeter pistol with unique "RIP ammo,"[1] which is made to "break away from the base when it impacts soft tissue," creating "various wound paths in the body causing damage." And then, the night before the shooting, Jenkins texted Morrise things like, "[Y]ou don't know how it feels to be hurt by someone you love the most"; "how is this shit so easy for you, like you wasn't my best fucking friend"; and "I fucking love you, bro. I don't deserve none of this shit you be doing to me."

Early the next morning, Jenkins drove from his home in Davenport to Morrise's apartment in Cedar Rapids. He brought his new gun and ammo with him. Jenkins borrowed his sister's gold Ford Fusion for the drive, he said because his "car was being worked on by a family mechanic." But Morrise testified that

---

[1] A criminalist at the state crime lab testified that "RIP" stands for "radically invasive projectile."

Jenkins always drove his white Audi, and she had never seen him drive the Fusion before.

Geographical data extracted from the Fusion shows that, as early as 5:33 a.m., the vehicle was in the parking lot of a birthing center near a Casey's gas station in Cedar Rapids, just a few blocks southwest of Morrise's apartment. Jenkins testified that while he was sitting in that parking lot, he texted Ward to have Morrise put a laundry basket that contained his clothes and some money outside her front door. Jenkins claimed that he didn't know Ward was at Morrise's apartment until he saw Ward's vehicle there. The data from the Fusion shows the vehicle leaving the birthing center parking lot at 5:57 a.m. and traveling to the nearby Casey's, where it remained from 5:58 a.m. to 6:01 a.m. The surveillance system at the Casey's captured Jenkins parking the Fusion in the lot, briefly entering the store, and then departing in the Fusion.

Separate footage from surveillance systems located at a FasMart convenience store next to Morrise's apartment, a coffee shop in the same building as Morrise's apartment, and a laundromat in the same building collectively show the following. At roughly 7:21 a.m.,[2] Jenkins pulled into the parking area of the coffee shop and parked in a space from which he could see the door to Morrise's apartment building. The footage from the laundromat shows Morrise and Ward leaving the apartment through that door at 7:42 a.m. Morrise testified that Ward was taking her to work.

---

[2] The record does not show where Jenkins or the Fusion were between 6:01 a.m. and 7:21 a.m. A crime intelligence analyst for the police department testified the vehicle data track for that period was incomplete.

Upon their exit, Jenkins quickly backed out of his space, proceeded to where Morrise and Ward were backing out of their space in Ward's black Monte Carlo, and stopped in the travel-portion of the lot. After finishing a two-point turn out of their parking space, Morrise and Ward drove by where Jenkins was stopped facing the opposite direction. Even though Jenkins claimed to have texted Ward that morning about his laundry basket, Morrise testified that she was surprised to see Jenkins in the gold car as they drove by it. The video shows Jenkins quickly accelerated as they passed him, made a u-turn, and gave chase to Ward's car.

With Jenkins in pursuit, Morrise and Ward pulled into a nearby FasMart gas and parked next to a fuel pump. Security footage shows Jenkins followed them into the FasMart and parked right next to them. Morrise testified that, at this point, Ward "said he was going to beat [Jenkins's] ass," but she could not recall if Ward said that to just her or to Jenkins as well. Ward then pulled out of the FasMart, and Jenkins followed, accelerating rapidly. During the chase, Jenkins called Morrise's phone. Ward answered and told Jenkins "to pull over so he could kick his ass."

At about 7:50 a.m., Ward pulled into a busy Kum & Go gas station about two miles away from Morrise's apartment because, according to Morrise, Jenkins was still following them and Ward wanted "to beat [Jenkins's] ass." The gas station's manager was outside cleaning pumps when she heard "the sound of cars racing down First Avenue." Video evidence shows the cars speeding into the station, where Ward parked at a fuel pump with Jenkins pulling in behind him. Ward got out of his vehicle and, according to the manager, walked "very briskly"

toward Jenkins, yelling something like, "come at me, bro." Morrise followed, trying to diffuse the situation.

Jenkins testified, "When I saw [Ward] walk towards my car, I loaded my handgun." Jenkins then got out of his car and, in his words, "brandished" his gun at Ward. Surveillance video from across the street shows that Ward kept walking toward Jenkins, who was backing away around the rear of his vehicle. Morrise testified that Jenkins was saying, "get back, man, get back," while Ward was saying, "shoot it, shoot it, shoot it." The view from the video of what happened next between Jenkins and Ward is blocked by a pickup truck.

But in that truck, a couple eating their breakfast had a front row seat to the fatal confrontation between the two men. The wife testified,

> [W]e heard some arguing and looked over and there were two gentlemen arguing with each other. And I said to my husband, "let's get out of here, you know, we don't want to watch this, we don't want to see something bad happen, somebody might have a gun." And just like that, the one gentleman flipped up his jacket and pulled out a gun. I went down on the floor, grabbed my cell phone to call 911, and my husband kept watching. And then I heard a girl yell, "don't shoot him, don't shoot him." He put his gun away and my husband said he put the gun away. I got back up and the gun was put away. And they started arguing again and the taller gentleman walked towards the man that had a gun and kinda took a swing at him. Wasn't close enough to hit him, but then he brought the gun out. I was on the phone with 911. I got down again and then I heard two or three shots.

The wife said the taller gentleman, who was Ward, fell after he took the swing at Jenkins. Because she ducked down when Jenkins pulled the gun back out, she didn't see any actual shots fired. Her husband did, however.

The husband, who described Ward as tall and slender while Jenkins was shorter and "a little bigger," testified:

We heard some confrontation going on. I rolled my window down a little bit to see if I could hear any more. All I heard was the screaming was a little bit louder. The two guys kind of started pushing one another. The one guy—At that point my wife said we should probably leave. And I said, well, just wait, see what happens. And she said, well, watch him pull a gun out of his pants. And no sooner did she say that, he did. He pulled a gun out of his pants or behind his shirt in the back. And at that point a girl, a young woman came up, and she said, "don't shoot him," because he pointed the gun at him. "Don't shoot him, don't shoot him." And he put the gun away. When he put the gun away, the taller black man stepped back, and then I don't know if his feet got tangled up or what, but he looked like he threw a punch. When he threw the punch, he fell to the ground. And when he fell to the ground, the gun came out again and he shot. And at that time I believe he hit him in the leg and the young man tried to get up and he started walking towards the black sedan dragging—I think it was his right leg. He fell again. And then the accused, he went up and shot again three, maybe four times.

Armond Dawson was pulling out of the Kum & Go after buying his morning coffee when he observed the confrontation. Dawson testified:

I saw two individuals square off in front of each other. One individual was holding a gun. The other individual was in a fighting stance. And as a result of that, I decided not to proceed forward to exit the station because I saw the firearm and I did not want to be in the line of fire. So I continued to back up. As I began to back up even further, I saw a gentleman that—excuse me. I guess the deceased or the victim, I saw him lunge at the person with the gun. And as I continued to back up, there was a van to my left that obstructed my view so I could not see what happened after that. I heard gunfire and so I stopped, and I saw a gold-colored car pull out and leave the gas station at the exit . . . .

On cross-examination, Dawson clarified that when he saw Ward "lunge" at Jenkins, he meant, "like a fake, like in a fighting stance . . . like you're going to throw a punch or a fake." He did not see Ward make contact with Jenkins. And he testified that Jenkins was pointing the gun at Ward before he saw Ward lunge toward him.

After the shooting, Jenkins sped out of the gas station and went to a park in Muscatine. He stayed there for about forty minutes before driving to a nearby fast-food restaurant where he switched out vehicles with a relative. Jenkins was not arrested until March 2020, when federal marshals found him in an Illinois hotel room with Morrise. As the marshals were gaining entry into the room, Jenkins tried to jump out a second-story window. During an interview with a police investigator the next day, Jenkins denied being in Cedar Rapids, even after he was shown a picture of himself at the Casey's the morning of the shooting. And he denied knowing Ward or ever talking to him. He later stated the only reason he had any contact with Morrise that day was because he "heard something bad was going on." While continuing to deny any involvement, Jenkins told the investigator that he had no hatred for anyone and doesn't "play offense, only defense."

Jenkins was charged by trial information with first-degree murder and going armed with intent. In time, Jenkins filed notices of his intention to rely on justification defenses. *See* Iowa Code §§ 704.3 (2019) (defense of self), .7 (resisting forcible felony); *see also* Iowa R. Crim. P. 2.11(11)(c). At the bench trial in mid-October 2021, Jenkins testified that he fled the scene and lied to the investigator because he was "afraid of what was to come next." What really happened, according to Jenkins, was that after Ward took a swing at him, Jenkins ducked. Ward then started pulling on his hoodie and tried to get the gun. Jenkins recalled thinking, "If he gets ahold of this firearm, I'm fucked." So he fired shots, "[o]ne quick one and then four more after that." Jenkins said the witnesses who testified that he shot Ward when he was on the ground were mistaken.

In its verdict, the court found Jenkins guilty as charged on both counts.  In rejecting Jenkins's claim of justification, the court found "a number of facts that negate[d]" that defense:

> The first is that Mr. Jenkins alone was armed on October 30, 2019.  The law pertaining to self-defense in the state of Iowa . . . recognize[s] that an individual who starts an incident that leads to injury or death may not avail himself of the defense.  The court analyzes the incident that began with Mr. Jenkins driving to Cedar Rapids in the wee morning hours of October 30, 2019, in a car that no one would connect to him, while armed with a Glock 9mm pistol that fires bullets designed to rip 9 wound paths through their target.  After waiting in a parking spot that is away from one's view while exiting [Morrise's] apartment building Mr. Jenkins began to pursue Mr. Ward and Ms. Morrise.  The location Mr. Jenkins chose to park belies the assertion he travelled to Cedar Rapids to collect his clothing and money.  He continued the pursuit after Mr. Ward threatened to "kick his ass."  He chased Mr. Ward for two miles until Mr. Ward parked at the Kum & Go.  He followed him into the store parking lot and exited the Ford Fusion while the angry, but unarmed Mr. Ward walked toward him.  Another fact in the record that undermines the claim of self-defense is that Mr. Jenkins got out of the Ford to escalate a war of words, which would have likely become a fist fight, to a deadly assault with a gun.  The eyewitnesses described the two men, only one armed with a gun, shouting at each other.  [They] described a lunge or a punch thrown by the unarmed man.  [The husband in the truck], who had the clearest view of the altercation, saw the unarmed Mr. Ward fall to the ground after throwing a punch that missed, he then watched Mr. Jenkins approach and shoot him.  The bullet trajectory described by State medical Examiner, Dr. Klein is consistent with Mr. Jenkins standing and firing the gun while Mr. Ward lies on his left hip, turned slightly away from Mr. Jenkins in an effort to get off the ground and return to the Monte Carlo.  The court has considered Mr. Jenkins' actions after the shooting.  Fleeing the scene to another state, remaining at large for a number of months and failing to mention he had to shoot or be shot by Mr. Ward when he spoke with police are not actions of an individual who shot in self-defense.

Jenkins moved for a new trial, arguing in relevant part that the verdicts were contrary to the weight of the evidence.  The court denied the motion and sentenced

Jenkins to life in prison without the possibility of parole for first-degree murder, with a concurrent sentence for going armed with intent. Jenkins appeals.

## II.     Sufficiency of Evidence

Challenges to the sufficiency of evidence following a bench trial are reviewed for correction or errors at law, with the court being "highly deferential" to the verdict. *State v. Burns*, 988 N.W.2d 352, 370 (Iowa 2023) (citation omitted); *see State v. Myers*, 924 N.W.2d 823, 827 (Iowa 2019) ("We review a claim of insufficient evidence in a bench trial just as we do in a jury trial."). We view "the evidence 'in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence.'" *State v. Ortiz*, 905 N.W.2d 174, 180 (Iowa 2017) (citation omitted). "While we consider all evidence—exculpatory and inculpatory alike—we are mindful in our standard of review that the [factfinder] is 'free to reject certain evidence, and credit other evidence.'" *State v. Seley*, No. 22-0419, 2021 WL 2148800, at *4 (Iowa Ct. App. Feb. 22, 2023) (citation omitted).

### A.     First-Degree Murder

#### 1.     Malice aforethought

Jenkins first argues the State failed to prove he killed Ward with malice aforethought, an essential element of any murder. *See* Iowa Code § 707.1. He argues no evidence was presented that he "held any hatred or evil intent towards Ward" and a mere dislike for him is not malice aforethought. In Jenkins's view, the evidence only showed he was trying "to get his stuff and leave," not start a confrontation or kill someone.

At the start, we note that the malice-aforethought element of murder "contemplates a 'condition of mind which prompts one to do a wrongful act intentionally, without legal justification or excuse.'" *State v. LuCore*, 989 N.W.2d 209, 217 (Iowa Ct. App. 2023) (quoting *State v. McCollom*, 151 N.W.2d 519, 525 (Iowa 1967)). Jenkins is correct that malice "does not mean mere spite." *McCollom*, 151 N.W.2d at 525. But it also does not mean hatred or ill will, as he suggests, instead requiring a "disposition which shows a heart regardless of human life." *Id.*

Malice aforethought involves "a fixed purpose or design to do some physical harm to another existing prior to the act complained of; it need not be shown to have existed for any length of time before; it is sufficient if such purpose was formed and continued to exist at the time of the injury." *State v. Reeves*, 670 N.W.2d 199, 207 (Iowa 2003) (cleaned up). "The establishment of malice aforethought does not require proof of specific intent to kill or motive, and it may be inferred from the acts and conduct of the defendant on either an express or implied basis." *LuCore*, 989 N.W.2d at 217 (footnote omitted). Specifically, malice aforethought may be inferred when a dangerous weapon is used. *State v. Green*, 896 N.W.2d 770, 780 (Iowa 2017). Yet this inference may be rebutted if the act was justified, which will be discussed later. *See Reeves*, 670 N.W.2d at 207.

The evidence, when viewed in the light most favorable to the State, shows that Jenkins was in a love triangle for nearly a year with Morrise and Ward. While Jenkins at first professed indifference, when confronted with his text messages to Morrise the night before the shooting, he admitted that it pissed him off. Roughly

a week before the shooting, Jenkins bought a new gun with special ammunition that the evidence showed had a heightened ability to cause damage—those being high velocity, hollow point, radically invasive projectiles.

With that in mind, we consider what happened next. Jenkins drove to Cedar Rapids early on October 30 in a vehicle he did not usually drive. Although Jenkins said that he was there to get the laundry basket with his clothes and money, the district court was free to discount that testimony based on its inconsistency with other evidence and Jenkins's interest in the trial. *See State v. Frake*, 450 N.W.2d 817, 819 (Iowa 1990). Once at Morrise's apartment, Jenkins parked in an inconspicuous spot until he saw Morrise leave her apartment with Ward. He then pursued them at high speeds for more than two miles, even though he said that he was scared of Ward. After they got to the Kum & Go, Jenkins loaded his gun with the special ammo while the unarmed Ward walked toward his car. Rather than driving away, Jenkins got out of his car and showed his gun to Ward.

While Jenkins initially backed away from Ward, the deciding factor is what happened in the blind spot on the video evidence. On this question, the court gave the most weight to the couple in the truck, given their "unobstructed view of the vehicles' approach and the altercation that followed." Both those witnesses testified that Ward fell to the ground after taking a swing at Jenkins. Once he was on the ground, the husband saw Jenkins shoot Ward. After being shot, Ward tried to get up, but fell again, and Jenkins "came up and shot him point blank three times."

These facts—Jenkins's beef with Ward as the other man in his relationship with Morrise, purchase of a firearm and ammo shortly before the shooting,

clandestine trip to Cedar Rapids, lying in wait and subsequent pursuit of Ward, and ultimate fatal shooting of him—provides substantial evidence of "a fixed purpose or design to do some physical harm to another existing prior to the act complained of." *See Reeves*, 670 N.W.2d at 207 (citation omitted). Even without those circumstances, substantial evidence shows that, when Ward fell, Jenkins took that opportunity to strike, and then did so again after Ward fell a second time. This signifies "a disposition which shows a heart regardless of human life," which is sufficient for malice aforethought. *See LuCore*, 989 N.W.2d at 217 (citation omitted). We therefore conclude the State provided sufficient evidence to support this element.

### 2. Deliberation and premeditation

First-degree murder also requires proof of deliberation and premeditation, *see* Iowa Code § 707.2(1)(a), which Jenkins argues the State failed to establish. As to his purchase of the pistol and ammunition shortly before the shooting, he submits that is consistent with self-defense. And Jenkins repeats his claim that he was at Morrise's apartment to get his clothes and money, pointing to his testimony that he did not know Ward would be there, his explanation about why he was driving a different car, and the fact that the shooting occurred in a public place.

Yet, "[s]upport for deliberation and premeditation may be found in circumstantial, as well as direct, evidence," and "[i]t is well settled that premeditation and deliberation need not exist for any particular length of time before the killing to warrant a conviction." *State v. Woodmansee*, 233 N.W. 725, 732–33 (Iowa 1930). "Deliberation and premeditation may be shown by circumstantial evidence in one of three ways: '(1) evidence of planning

activity, (2) evidence of motive which might be inferred from prior relationships between defendant and the victim, and (3) evidence regarding the nature of the killing.'" *State v. Linderman*, 958 N.W.2d 211, 221 (Iowa Ct. App. 2021) (cleaned up).

Here, we have all three. First, as to planning, Jenkins bought the new gun and ammo with heightened lethality a little more than a week before the shooting. He then brought the gun and ammo on his early morning trip to Cedar Rapids in a vehicle Morrise and Ward would not recognize. As noted above, the district court was entitled to discount Jenkins's explanation for being there. Second, for motive, we agree with the State that the evidence showed "a jealous and broken-hearted Jenkins." Third, on the nature of the killing, Jenkins discharged five rounds in two bursts while Ward was on the ground and trying to get away. *See State v. Poyner*, 306 N.W.2d 716, 718 (Iowa 1981) ("The multiple wounds refute any suggestion of inadvertence or mistake and supply strong evidence of malice and intent to kill."); *Linderman*, 958 N.W.2d at 222 ("A beating of that nature requires inflicting injury over and over such that a jury could infer deliberation and thoughtfulness with each blow."). With this evidence, we find the State met its burden to show deliberation and premeditation.

### 3. Justification

The State also had "to prove justification did not exist." *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993). Jenkins argues the evidence shows "Ward initiated the altercation," and he "had a reasonable belief that his use of force was reasonable and necessary to prevent the imminent and unlawful,

undisputed use of force by Ward." Jenkins also contends that he "did not provoke the use of force as a guise to engage Ward."

Jenkins filed notices of his intent to rely on the justification defenses of self-defense and resisting a forcible felony. As to the former, section 704.3 provides: "A person is justified in the use of reasonable force when the person reasonably believes that such force is necessary to defend oneself . . . from any actual or imminent use of unlawful force." Turning to the latter, section 704.7 provides: "A person who reasonably believes that a forcible felony is being or will imminently be perpetrated is justified in using reasonable force, including deadly force, against the perpetrator . . . to prevent or terminate the perpetration of that felony."

Since 2017, the statute on reasonable force has provided:

> 1. "Reasonable force" means that force and no more which a reasonable person, in like circumstances, would judge to be necessary to prevent an injury or loss and can include deadly force if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety or the life or safety of another, or it is reasonable to believe that such force is necessary to resist a like force or threat.
> 2. A person may be wrong in the estimation of the danger or the force necessary to repel the danger as long as there is a reasonable basis for the belief of the person and the person acts reasonably in the response to that belief.
> 3. A person who is not engaged in illegal activity has no duty to retreat from any place where the person is lawfully present before using force as specified in this chapter.

Iowa Code § 704.1; *accord State v. Lorenzo Baltazar*, 935 N.W.2d 862, 869 (Iowa 2019) (noting the 2017 amendment removed "the alternative-course-of-action language and added the stand-your-ground provision"). While the 2017 amendment changed the implied duty to follow an alternative course of action, it did not eliminate it. *Lorenzo Baltazar*, 935 N.W.2d at 870. A duty to retreat is still

alive and well "if the activity is illegal or the presence unlawful." *Id.* So if the shooter is engaged in conduct in violation of another criminal statute that directly relates to the shooting—like going armed with intent—then the duty to retreat disqualifies a defendant from asserting a justification defense. *See id.* at 871.

So now, to rebut a justification defense, the State must prove one of the following: (1) "[t]he defendant started or continued the incident which resulted in death," *State v. Fordyce*, 940 N.W.2d 419, 426 (Iowa 2020); (2) "[t]he defendant did not have a reasonable belief that it was necessary to use force to prevent injury or loss"; (3) "[t]he defendant used unreasonable force under the circumstances"; or (4) "[t]he defendant was engaged in illegal activity in the place where he used force, he made no effort to retreat, and retreat was a reasonable alternative to using force." *State v. Ellison*, 985 N.W.2d 473, 478 (Iowa 2023).

For starters, there was substantial evidence that Jenkins started and continued the confrontation that resulted in Ward's death. *See, e.g.*, *State v. Wilson*, 941 N.W.2d 579, 591 (Iowa 2020) (finding substantial evidence to prove lack of justification where defendant started the confrontation). He began the pursuit of Ward and continued it, even after the unarmed Ward threatened to beat Jenkins. While Jenkins did, at one point, back away from Ward at the Kum & Go, he reengaged when Ward fell. Beyond that, Jenkins knew Ward was unarmed, so his "use of force was unreasonable because he 'brought a [gun] to a fistfight—he used lethal force without any indication that he faced danger that made it reasonably necessary' to shoot the unarmed" Ward. *Seley*, 2023 WL 2148800, at *6 (alteration in original) (quoting *State v. Bowers*, No. 18-1827, 2020 WL 1310290, at *2 (Iowa Ct. App. Mar. 18, 2020)). In other words, substantial

evidences shows that Jenkins "escalated the level of force beyond what was reasonable under the circumstances." *Id.* (quoting *State v. Hall*, No. 15-0628, 2016 WL 2748358, at *4 (Iowa Ct. App. May 11, 2016)).

And Jenkins's argument for reasonable force is only based on his claim that Ward reached for and got a hand on the gun. But, viewing the evidence in the light most favorable to the State and deferring to the district court on credibility, the evidence shows that didn't happen. *See State v. Jones*, 967 N.W.2d 336, 343 (Iowa 2021) ("While the defendant has an alternative explanation for the evidence, the jury was not required to accept the defendant's version of the events." (cleaned up)). It instead shows that, while Ward took a wild swing at Jenkins, he missed and fell to the ground, at which point Jenkins shot a defenseless Ward, according to witnesses who watched the shooting. Jenkins nevertheless argues the district court's conclusion that Ward was on the ground when he was shot conflicts with the medical examiner's testimony. But the medical examiner never said that Ward could not have been on the ground. Instead, he testified that the position *Jenkins* said they were in when the shots were fired was "unlikely." In our view, a conclusion that Ward was on the ground when he was shot is supported by substantial evidence.

Based on these facts, we find sufficient evidence that the force used by Jenkins was not reasonable, and he was therefore not justified in shooting Ward.

**B.    Going Armed with Intent**

Under Iowa Code section 708.8, a "person who goes armed with any dangerous weapon with the intent to use without justification such weapon against the person of another commits a class 'D' felony." On his conviction for this crime,

Jenkins repeats the claim that he was justified in the shooting. For the reasons outlined above, we summarily reject that challenge.

Jenkins also claims "the State did not carry its burden of proving that [he] intended to use a weapon against Ward" because "when Jenkins left his house that morning, there was no evidence that [he] knew Ward was at the apartment." This argument again depends on the court buying Jenkins's version of the events, which it was not required to do. *See id.* As laid out on the malice aforethought, premeditation, and deliberation elements of the murder conviction, there was substantial evidence that Jenkins formed the intent to use his new gun and its uniquely lethal ammo well before the happenings at the Kum & Go.

And there was also substantial "proof of movement" at the Kum & Go. *See State v. Harris*, 891 N.W.2d 182, 185 (Iowa 2017) ("We have . . . explained that the 'going' element of going armed with intent 'necessarily implicates proof of movement.'" (citation omitted)). Jenkins testified that as Ward walked over to him, he loaded the gun, got out of his car, and showed it to Ward as they argued. The front row witness to their argument testified that after Jenkins shot Ward on the ground, Jenkins advanced on Ward as he tried to hobble back to his car "and shot him almost point blank three times" again. This is sufficient evidence of movement. *See State v. Smith*, No. 16-1201, 2017 WL 218621, at *2 (Iowa Ct. App. May 17, 2017) ("An armed defendant need not cover any great distance."); *see also Harris*, 891 N.W.2d at 187 (finding movement of knife from inside a bar to outside sufficient); *State v. Pearson*, 804 N.W.2d 260, 265 n.1 (Iowa 2011) (finding movement across kitchen sufficient); *State v. Ray*, 516 N.W.2d 863, 865 (Iowa 1994) (finding movement from house to front yard sufficient).

### III.    Motion for New Trial—Weight of Evidence

Lastly, Jenkins claims the court abused its discretion in denying his new-trial motion on weight-of-the-evidence grounds.  But, in reality, this claim is just a repackaging of his challenges to the sufficiency of the evidence.

In any event, we review the district court's denial of a motion for a new trial on weight-of-the-evidence grounds for an abuse of discretion—the most deferential standard of review.  *See State v. Stendrup*, 983 N.W.2d 231, 246 (Iowa 2022); *see also State v. Roby*, 897 N.W.2d 127, 137 (Iowa 2017).  When a claim is made that the verdict is contrary to the weight of the evidence, "the verdict may be set aside and a new trial granted" if "the court reaches the conclusion that the verdict is contrary to the weight of the evidence and that a miscarriage of justice may have resulted."  *State v. Serrato*, 787 N.W.2d 462, 472 (Iowa 2010) (quoting *State v. Ellis*, 578 N.W.2d 655, 658–59 (Iowa 1998)).  "A verdict is contrary to the weight of the evidence where 'a greater amount of credible evidence supports one side of an issue or cause than the other.'"  *State v. Shanahan*, 712 N.W.2d 121, 135 (Iowa 2006) (quoting *Ellis*, 578 N.W.2d at 658).

In our view, this is not one of those "exceptional cases in which the evidence preponderates heavily against the verdict."  *Ellis*, 578 N.W.2d at 659 (citation omitted).  In ruling on the motion, the district court noted its review of the motion, resistance, its verdict, and the transcript of trial.  Based on that review, the court found "the weight of the evidence presented at trial does support each of the verdicts that the court issued."  "And because this was a bench trial, the district court necessarily assessed the credibility of the witnesses in reaching its verdict."  *See Stendrup*, 983 N.W.2d at 246.  We find no abuse of discretion in the court's

decision and affirm. *See id.* ("Our review is not to determine whether the verdict is contrary to the weight of the evidence but only to determine whether the district court abused its considerable discretion in denying the motion.").

## IV. Conclusion

We affirm, finding the evidence was sufficient to support the convictions and the court did not abuse its discretion in denying the motion for a new trial.

**AFFIRMED.**